UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES -- GENERAL

Case No.     **CV 22-1350 JFW(MARx)**                                    Date: April 14, 2022

Title:       The Real USFL, LLC -v- Fox Sports, Inc.

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| Shannon Reilly | None Present |
| Courtroom Deputy | Court Reporter |

**ATTORNEYS PRESENT FOR PLAINTIFFS:**          **ATTORNEYS PRESENT FOR DEFENDANTS:**
              None                                                       None

**PROCEEDINGS (IN CHAMBERS):**    **ORDER DENYING PLAINTIFF THE REAL USFL, LLC'S MOTION FOR PRELIMINARY INJUNCTION [filed 3/17/22; Docket No. 71]**

On March 17, 2022, Plaintiff The Real USFL, LLC ("Plaintiff" or "The Real USFL") filed a Motion for Preliminary Injunction ("Motion"). On March 28, 2022, Defendants Fox Sports, Inc., The Spring League, LLC, USFL Enterprises, LLC, Fox Corporation, Fox Sports 1, LLC, Fox Sports 2, LLC, Fox Sports Productions, LLC, Foxcorp Holdings, LLC, Fox Media, LLC and Fox Sports Interactive Media, LLC ("Defendants") filed their Opposition. On April 4, 2022, Plaintiff filed a Reply. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument. The hearing calendared for April 18, 2022 is hereby vacated and the matter taken off calendar. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I.      FINDINGS OF FACT**[1]

    **A.      The History of the USFL and Formation of Plaintiff, The Real USFL, LLC**

In 1982, a group of investors launched a springtime professional football league called the

---

[1] Plaintiff's and Defendants' separate, unopposed requests for Judicial Notice (Docket Nos. 114 & 125) are **GRANTED**. *See, e.g., Threshold Enters. Ltd. v. Pressed Juicery*, 445 F. Supp.3d 139, 145-46 (N.D. Cal. 2020) ("Materials in the online files of the USPTO and other matters of public record are proper subjects of judicial notice") (citations omitted); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (judicial notice of court filings and other matters of public record appropriate under Fed. R. Evid. 201(b)).

United States Football League ("USFL" or "Old League").  The USFL had three successful seasons, featuring well known players such as Herschel Walker, Steve Young, Jim Kelly, Doug Flutie and Reggie White.  The USFL ceased to exist in 1986 after an ill-fated attempt to move its season to the fall to directly compete with the National Football League ("NFL"), and ultimately force a merger.  As part of this strategy, the USFL filed an antitrust lawsuit against the National Football League in 1986.  The USFL prevailed on the merits of its lawsuit but was awarded only $1, which was trebled for a total of $3, well below its claimed damages of $1 billion.  The court also awarded the USFL approximately $5.5 million in costs and attorney's fees.  The jury's verdict effectively ended the USFL's existence in 1986.   Ehrhart Declaration ¶¶ 2-4; Woods Declaration, Ex. 2.

After the league disbanded, USFL owners elected Steve Ehrhart to serve as the chairman of the USFL Executive Committee in order to preserve what was left of the name and legacy of the USFL.  Ehrhart Declaration ¶5.  Specifically, Mr. Ehrhart collected and distributed the USFL's damages and attorneys' fee awards from the case against the NFL.  *Id.*  In addition, decades later, Mr. Ehrhart entered into purported licensing arrangements for apparel, books and films, including:

(1) July 2011 licensing agreement with American Classics to produce throwback t-shirts featuring USFL and USFL Team Logos;[2]
(2) July 2016 release to Paul Reeth to use the USFL league and team logos in his book entitled *The United States Football League, 1982-1986* (published April 3, 2017); and
(3) April 2008 release granting Ken Dunek the rights to use the USFL's name, logo, likeness and game footage video for a planned documentary about former USFL player Sam Mills.

*Id.,* ¶¶ 8, 9, 12, 16.   Mr. Ehrhart also engaged in other public and commercial activities in order to fulfill his mission. Specifically, Mr. Ehrhart hosted a reunion and golf tournament in 2007, gave an interview for an ESPN documentary in 2008, periodically consulted on potential books and film projects about the USFL and USFL players in 2006, 2008-2010 and 2016, and managed royalty payments from American Classics' sale of licensed USFL apparel from 2011 to 2021.[3]  *Id.* at ¶¶ 8-16.  Thus, after distributing the damages, costs and attorneys' fees awarded to the USFL in the 1986 lawsuit, there is no evidence that Mr. Ehrhart engaged in any USFL related activities until 2006 (nearly twenty years later).

Plaintiff The Real USFL is a New York limited liability company formed on February 22, 2022.  Motion at p. 10:27-28; Wesley Declaration, Ex. 12.  The Real USFL is a holding company formed by former USFL team owners and devisees which purports to now hold the interests in all trademarks relating to the Old League.  Motion at pp. 9-10.  The FAC alleges that "numerous former owners and executives of the League formed the Real USFL to hold and enforce their rights," and that these individuals "have each assigned all relevant rights to The Real USFL."  FAC

---

[2] On October 24, 2011 the merchandise displaying the USFL and USFL Team logos was listed for sale on the American Classics website. Brown Declaration ¶ 4.

[3] Jerry Argovitz, also a member of Plaintiff and former owner of the Old League Houston Gamblers, submitted a declaration stating that he hosted team reunions in 2010, 2015 and 2019. Argovitz Declaration ¶ 2.

¶ 75; Dillman Declaration, ¶ 17.  In late February 2022, immediately after filing Articles of Organization for The Real USFL, Mr. Ehrhart and nine former team owners or their representatives assigned their rights in the USFL's original trademarks to The Real USFL.  Dillman Declaration, Exs. 16-25.[4]

B.  **The New League**

On June 3, 2021, Defendants The Spring League, LLC ("TSL") and USFL Enterprises, LLC ("USFL Enterprises") announced the launch of a new professional spring football league, also called the United States Football League ("New League").[5]  The press release stated:  "Today, the United States Football League (USFL) announced that the league will officially return in the spring of 2022.  Initially launched in 1983, the USFL originally was an upstart spring football league....When relaunched next year, the USFL Enterprises retains rights to key original team names." The press release concludes, "[t]he relaunch of the USFL is a landmark day for football fans and Fox Sports, said Eric Shanks, CEO and Executive Producer, Fox Sports."  Dillman Declaration, Ex. 9.  Defendant Fox Sports, Inc. ("Fox")[6] was named in the release as the USFL Enterprises' "Official Broadcast Partner."  *Id.*

After the initial press release Mr. Ehrhart was interviewed by the Philadelphia Enquirer, and expressed his surprise to hear that the New League was claiming rights to the name USFL and the team names.  Ehrhart Declaration, Ex. 14.  Mr. Ehrhart also called Fox Sports Executive Vice President Larry Jones to discuss the misleading nature of the initial press release.  Ehrhart Declaration ¶¶ 17-18.  Fox then revised the press release to omit the language suggesting that the New League was a relaunch of the original USFL.  FAC ¶ 61.

The revised press release failed to address any confusion created regarding the relationship between the Old League and the New League.  Subsequent to the June 2021 press release, Mr. Ehrhart and several of the former USFL team owners received numerous calls and inquiries raising questions about a "relaunch" of the USFL, and specifically asking whether any of the original USFL

---

[4] Plaintiff's First Amended Complaint ("FAC") alleges that the assignors include the former owners or heirs of the (1) Birmingham Stallions; (2) Philadelphia/Baltimore Stars: (3) Michigan Panthers; (4) Houston Gamblers; (5) New Orleans Breakers; (6) Jacksonville Bulls; (7) Oklahoma/Arizona Outlaws; (8) Tampa Bay Bandits; (9) Oakland Invaders; and (10) Memphis Showboats.  FAC ¶ 75.

[5] Defendant TSL was established in 2016 to form a developmental spring football league.  TSL played five seasons of football from 2017-2021.  Woods Declaration ¶ 7.  Defendant USFL Enterprises is the exclusive licensee of the TSL's trademark rights.  Wesley Declaration ¶ 7 & Woods Declaration ¶ 10.  On October 19, 2021, when TSL and USFL Enterprises executed the license agreement, USFL Enterprises was named NSFL Enterprises Co, LLC. ("NSFL") Woods Declaration ¶ 10.

[6]  The term "Fox" also includes the other Fox-entities named as defendants in the FAC--Fox Corporation, Fox Sports 1, LLC, Fox Sports 2, LLC, Fox Sports Productions, LLC, Foxcorp Holdings, LLC, Fox Media, LLC and Fox Sports Interactive Media, LLC.  The Court refers to Fox, USFL Enterprises and TSL collectively as "Defendants."

owners were involved in the New League.  Ehrhart Declaration ¶ 17; Argovitz Declaration, Duany Declaration, Taube Declaration, Taubman Declaration.  The media coverage of the New League is replete with examples of reporters who assume that there is a connection between the Old League and the New League. Defendants intentionally decided to use the same league name and team names.  They have also used former USFL players to promote the New League in order to establish a connection between the Old League and the New League. Dillman Declaration ¶¶ 9-13 & Exs. 9-12.

The New League announced its team names and logos in a press release dated November 22, 2021.[7]  Woods Declaration, Ex. 6.  Since the June 2021 press release, The New League has also announced a multi-year media rights agreement with NBC, announced stadium deals in Birmingham and Canton, launched a line of apparel through internet based sales, announced head coaches, commenced ticket sales and held its inaugural draft on February 22-23, 2022.  Woods Declaration ¶ 19.  The New League now has over 300 players on eight teams attending training camps.  Games are scheduled to begin on April 16, 2022.  Hale Declaration ¶¶ 11-14.  In preparation for the league's debut, Defendants have invested tens of millions of dollars in acquiring intellectual property rights, advertising, broadcasting, stadium and apparel deals, and in hiring players, coaches, trainers, and other staff, and in branded uniforms and equipment.  Hale Declaration ¶ 21.  They have also entered into numerous business partnerships and relationships for ticketing, advertising and apparel sales.  Hale Declaration ¶¶ 8-21; Opposition at p. 4.

Based on Defendants' substantial undertaking, a number of third parties have also invested considerable resources in the New League. NBC has entered into a multi year deal with the Defendants.  NBC plans to exhibit 20 of the regular season games and one play off game for the first season on several of NBC's broadcast platforms.  Miller Declaration ¶ 5.  NBC has invested significant time, effort and resources in preparing for the exhibitions and promotion of the broadcasts.  Miller Declaration¶¶ 6, 8-14.  NBC used all the relevant league and team marks in preparation for the production of the exhibitions.  *Id.*  NBC has also sold around $5 million of advertising and sponsorship commitments to third parties in connection with the planned New League programming.  *Id.* at ¶ 6.

The City of Birmingham, Alabama, host to the majority of the season's scheduled games, has also invested substantial resources in the New League in order to ensure its success and to benefit from the economic prosperity in the area as a result of the New League's operational presence.  *See* Waggoner Declaration, Hallman Declaration, Snider Declaration, Stephens Declaration, McAdory Declaration, and Hale Declaration.  Defendants have entered into agreements with Protective Stadium and Legion Stadium (both located in Birmingham) to host regular season games and provide concessions.  Hale Declaration ¶ 16.  The New League has also contracted with the Sheraton in Birmingham to house players during the 2022 season.  *Id.*  For promotion purposes, the New League has hired Birmingham sports marketing and event management firm Bruno Event Team to provide marketing, public relations, media, event ticketing and operations support.  *Id.*  The City of Birmingham expects the presence of the New League to benefit the local economy, and its local and county agencies have invested millions of dollars in

---

[7] The New League teams include: (1) Michigan Panthers; (2) New Jersey Generals; (3) Philadelphia Stars; (4) Pittsburgh Maulers; (5) Birmingham Stallions; (6) Houston Gamblers; (7) New Orleans Breakers; and (8) Tampa Bay Bandits.  Wood Declaration, Ex. 6.

supporting the New League's decision to play its first season in Birmingham. Waggoner Declaration; Stephens Declaration; Snider Declaration.

      **C.**      **The League and Team Marks**

During its brief existence from 1982-1986, the USFL registered approximately 400 trademarks for the USFL name and logo, and the names and logos for 18 different teams. ("Original USFL Marks"). Wesley Declaration ¶ 16 & Ex. 11. It is undisputed that the United States Patent and Trademark Office ("USPTO") had canceled or declared all of the Original USFL Marks "dead" by 1992. *Id.* Although Mr. Ehrhart conducted minimal activities on behalf of the USFL and entered into a licensing agreement relating to the Original USFL Marks, there is no evidence that the USFL ever assigned those rights to Mr. Ehrhart or to any of the team owners. In fact, Plaintiff's Motion concedes that "registration for the USFL marks made in the 1980s lapsed." Motion at p. 14:20-21.

Prior to the June 2021 launch of the New League, defendants USFL Enterprises and TSL began acquiring trademark registrations for the trademark "USFL" ("League Marks") for use with the games and with apparel, and for team names and logos ("Team Marks") (collectively the "Marks"). There appears to be no dispute that defendant TSL owns, and that defendant USFL is the exclusive licensee, of the following League and Team Marks:

   (1)   **Trademark Registration 4,165,542**–Active and Incontestable (USFL word mark for apparel). Originally filed 3/24/11, First Use, 12/31/12, Registered 6/26/12;
   (2)   **Trademark Registration 4,808,689**–Active (USFL work mark for entertainment). Originally filed 3/24/11, First use 8/1/14, Registered 9/8/15;
   (3)   **Pending trademark registration applications** (filed in January 2021 and assigned to TSL by World Record Headquarters ("WRHQ") for: United States Football League, Houston Gamblers, Michigan Panthers, New Jersey Generals, Philadelphia Stars and Tampa Bay Bandits; and
   (4)   **Pending intent to use applications** (filed by TSL in January 2021) for: United States Football League, USFL, Birmingham Stallions, Houston Gamblers, Michigan Panthers, New Orleans Breakers, Pittsburgh Maulers and Tampa Bay Bandits.

Dillman Declaration ¶¶ 3-7, Exs. 2-7. *See* Wesley Declaration, ¶13 & Ex. 9 ("True and correct copies of the USPTO records for all the TSL-owned marks licensed to USFL Enterprises"). *See also* Dillman Declaration ¶ 3, Ex. 2 (referencing true and correct index of the Defendants' 175 "registered and pending trademarks" for both League and Team Marks). The Court will hereafter refer to Trademark Nos. 4,165,542 and 4,808,689 as the "Registered Marks", the pending trademark applications that were assigned to TSL by WRHQ as the "WRHQ Applications," and the pending intent to use applications as "TSL Applications."

The history of the rights to the League Marks and Team Marks acquired by Defendants is complex, but can be summarized as follows:[8]

---

[8] Defendants fail to properly explain or clarify the history of these Marks in their Opposition and Exhibits which required the Court to spend many hours reviewing the hundreds of pages of USPTO filings Defendants submitted in order to understand the Marks ownership issue, which

### 1. USFL-2011 Applications

On March 24, 2011 an unrelated entity also calling itself the United States Football League, LLC ("USFL-2011") filed an application with the USPTO for a standard character trademark registration of the term "USFL" relating to athletic apparel.[9]  Dillman Declaration Ex. 3. This mark was registered on June 26, 2012, Trademark Registration Number 4165542 and is Incontestable.  *Id.*  On March 24, 2011 USFL-2011 filed an application with the USPTO for a standard character trademark registration of the term "USFL" relating to entertainment.  Dillman Declaration, Ex. 4.  This mark was registered on September 8, 2015, Trademark Registration Number 4808689.  *Id.*

### 2. USFL-2011 Assignment to WRHQ

On January 31, 2021, USFL 2011 assigned its interests in the two Registered Marks and the open trademark registration applications to WRHQ.  Dillman Declaration, Ex. 5; Woods Declaration ¶ 8.  According to their agreement, the assigned marks included the two Registered Marks and three other League Marks, for a total of five League Marks.  Dillman Declaration, Ex. 5.

### 3. WRHQ Assignment to Defendants

On April 9, 2021, WRHQ assigned its interests to defendant TSL.  Wesley Declaration ¶ 8; Dillman Declaration, Ex. 6.  The assignments included the two Registered Marks.  *Id.;* Wesley Declaration, Exs. 3 & 4.  The WRHQ assignments also included the WRHQ Applications–17 pending applications for League and Team Marks filed in January 2021.  *Id.* at ¶ 12 & Ex. 7;

---

Defendants heavily rely on in their Opposition.

[9] Plaintiff claims that this registration was fraudulent because the registrant, Jaime Cuadra misrepresented his association with the original USFL, Hall of Fame players and former coaches.  FAC ¶¶ 36-41 & Motion at pp. 6-7.  In support of its claim, Plaintiff relies on Exhibit 4 to the Dillman Declaration.  Exhibit 4 consists of 168 pages of USPTO documents, including correspondence, applications, facsimile cover sheets and more.  Plaintiff apparently expected the Court to find the relevant evidence in support of the alleged fraud because its Motion failed to cite to any specific pages within this exhibit.  Dillman Declaration, Ex. 4.  Plaintiff's Reply referenced two pages in Exhibit 4.  Both pages consist of copies of slides from power-point presentations submitted by Mr. Cuadra in support of documents filed with the USPTO.  One of those slides depicts a USFL logo.  Dillman Declaration, Ex. 4 at p. 161.  The second appears to be part of a business plan and mentions starting a new spring football league and some reasons why it would be successful.  *Id.* at p. 125.  The pages cited do not contain any facially apparent misrepresentations, and Plaintiffs do not refer to any other evidence in their submissions to explain the basis for the alleged fraud.  Reply at p. 2 n. 4.  The Court rejects the invitation to find the other evidence to support Plaintiff's claim.  Simply stated, "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

Dillman Declaration, Ex. 6.[10]  Several of these applications were "**allowed**" by the USPTO in November 2021, but they are not yet registered.  *Id.*

In preparation for launching a new football league using the "USFL" and "United States Football League" brands, TSL submitted a number of intent to use applications for League Marks and Team Marks.  Wesley Declaration ¶ 13 & Ex. 8; Woods Declaration  ¶ 8. These TSL Applications are also pending.  *Id.*   Beginning in October 2021, USFL Enterprises (at that time using the name NSFL) submitted additional registration applications for League and Team Marks ("USFL Applications").[11]   It is undisputed that Defendants relied on all of these Marks–both League and Team, and whether approved, allowed or pending--in its announcements, marketing and publicity and in its design of team logos and uniforms relating to the launch of the New League.

### D.     The Parties' Pre-Litigation Discussions

After the June 2021 announcement of the New League, former members of the USFL asserted their ownership interests and respective rights to the USFL and Team Marks. Throughout these conversations, Defendants consistently maintained their rights to use these Marks in the launch of the New League, and asked Plaintiff for evidence of its ownership in the Marks.  Plaintiffs never supplied the requested information.

In June, 2021, Mr Ehrhart publicly questioned Defendants' right to use the USFL logo and team names.  Woods Declaration, Ex. 8.  On July 14, 2021,  Mr. Ehrhart met with Fox Sports' Executive Vice President Larry Jones to discuss his position that the New League's use of the Marks was improper and would mislead the public.  Ehrhart Declaration ¶ 18.  Mr. Jones informed

---

[10] Defendants fail to offer evidence or explain the origin of the applications for Team Marks that were ultimately assigned by WRHQ to TSL in April 2021.  It is unclear whether WRHQ filed the applications, or whether they were assigned to WRHQ by USFL-2011 in a separate agreement that was not provided to the Court.  The Court's review of the evidence, however, indicates that these applications were filed by WHRQ in January 2021.   Mr. Wesley claims in his declaration that defendant TSL owned more than one hundred applications for Team Marks, and that the USPTO has "allowed" more than twenty.  Wesley Declaration ¶ 7.  The Declaration fails to offer any evidence or explain the basis of this claimed "ownership."  Moreover, Mr. Wesley provides evidence of two of the twenty applications that were approved as "examples" but fails to provide evidence, or even list by name, the others that were allowed.  *Id.*

[11]  The Court is left to presume that the Registered Marks, WRHQ Applications, TSL Applications and USFL "Applications, along with the unspecified "allowed" marks comprise all of the League and Team Marks over which Defendants assert ownership rights.  Moreover, Defendants conclude their presentation of evidence regarding the Marks by providing 296 pages of USPTO records without a Table of Contents or any other means to identify, the evidence that purports to represent "all TSL-owned marks licensed to USFL Enterprises."  Wesley Declaration  ¶ 13 & Ex. 9.  Plaintiff's submissions help clarify this confusion.  Plaintiff's FAC alleges that Defendants claim ownership in 175 Marks that were used to launch the New League, and have provided the Court with a list of 175  "registered and pending trademarks" for both League and Team Marks belonging to defendants TSL and USFL Enterprises  (designated as Owners on the Exhibit).  Dillman Declaration ¶ 3 & Ex. 2.

Mr. Ehrhart that Fox owned the rights to the Marks, and was not interested in any additional meetings or discussions questioning Fox's ownership of the Marks. *Id;* Motion at p. 8.[12]

Mr. Ehrhart and a group of former USFL owners then spoke to a former USFL attorney, Bert Deixler, and retained him to protect the rights of the Old League's owners. Mr. Deixler sent a letter to Brian Woods, CEO of TSL on August 20, 2021. Ehrhart Declaration ¶ 19. The letter claimed that Defendants were using the USFL name unlawfully, and the Old League owners were interested in a resolution that would provide a basis for their favorable endorsement of the New League. Dillman Declaration, Ex. 13. Mr. Woods' attorneys responded in September 2021, stating their position that the Old League was "dead," and that the former USFL owners had abandoned the League and Team Marks. Dillman Declaration, Ex. 14. Mr. Deixler wrote back and requested a meeting to attempt to find a "modus vivendi"--an agreement allowing conflicting parties to coexist peacefully--but Defendants never responded. Dillman Declaration, Ex. 15. Mr. Deixler then referred the Old League owners to a trademark lawyer in Los Angeles, Stephen Strauss. Strauss Declaration ¶ 2. Mr. Strauss contacted Lynn Jordan, the attorney of record for the USFL Enterprises trademark applications on December 9, 2021. *Id.* at ¶ 3. He explained that although the Old League owners were interested in working with Fox to preserve the Old League's legacy, they wanted recognition for the Old League and its accomplishments. *Id.* Ms. Jordan replied that she would convey the message to her client.[13] *Id.* Mr. Strauss never heard back from Ms. Jordan. *Id.*

On December 14, 2021, David Bernstein, Fox's counsel in this case, responded to Mr. Strauss and asked that the Old League produce evidence of their USFL trademark rights. Strauss Declaration ¶ 4 & Ex. B. On December 17, 2021 Mr. Strauss responded, but did not send any information regarding the Old League's alleged trademark rights. He instead suggested a meeting where they could discuss the evidence. Strauss Declaration, Ex. 3. Two days later, Mr. Bernstein sent a cease and desist letter to David Brown, the President of American Classics, the Old League's sole licensee for USFL apparel. Brown Declaration, Ex. 5. Mr. Brown responded by sending a copy of the License Agreement between American Classics and Mr. Ehrhart, and other records relating to the royalty payments. Brown Declaration ¶ 10. In order to avoid threatened litigation, American Classics ceased selling the USFL merchandise in December 2021. *Id.*

Plaintiff filed this action on February 28, 2022. Plaintiff filed a First Amended Complaint ("FAC") on March 17, 2022. The FAC alleges: (1) Trademark Infringement under Lanham Act §1125(a)(1)(A); (2) False Advertising under Lanham Act § 1125(a)(1)(B); (3) False Association under Lanham Act § 1125(a)(1)(a); (4) Unfair Competition under Cal. Bus. & Prof. Code §§ 17200, et seq.; (5) False Advertising under Cal. Bus. & Prof. Code §§ 17500, et seq.; (6) Trademark Infringement under California Common Law; and (7) Tortious Interference with Contract and/or

---

[12] Mr. Ehrhart states that he sent Mr. Jones a copy of the "official licensed USFL history." Ehrhart Declaration ¶ 18. Plaintiff, however, did not submit this document in support of its Motion.

[13] Mr. Strauss recalls that Ms. Jordan said she thought it was a "good idea" to involve the Old League; although Ms. Jordan does not recall making that statement, she does not deny making it. Strauss Declaration ¶ 3. Jordan Declaration ¶ 7. This factual dispute is not material to the Court's disposition of this Motion.

Business Relations.[14]  Docket No. 67.  On March 17, 2022 Plaintiff filed this Motion seeking injunctive relief to prevent Defendants from using the League or Team Marks in connection with the New League.  Docket No. 71.

## II. LEGAL STANDARD

Injunctive relief is "an extraordinary remedy that may only be issued upon a clear showing that plaintiff is entitled to such relief."  *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008).  A plaintiff seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm absent a preliminary injunction; (3) that the balance of equities tips in the moving party's favor; and (4) that an injunction is in the public's interest. *Id.* at 20; *see also American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). The Ninth Circuit has confirmed that its "serious questions" approach survived *Winter*  when applied as part of the four-element *Winter* test. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011).  In other words, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

## III. CONCLUSIONS OF LAW

Although Plaintiff has produced evidence that satisfies the likelihood of success on the merits prong, Plaintiff is not entitled to a preliminary injunction because Plaintiff has failed to establish the other three requisite elements: (1) a likelihood of irreparable harm if a preliminary injunction is not granted; (2) that the balance of equities tips in Plaintiff's favor; and (3) that a preliminary injunction is in the public interest.

### A. Likelihood of Success on the Merits--Plaintiff's Trademark Infringement Claim[15]

To prevail on a trademark infringement claim, a plaintiff must demonstrate: "(1) that the plaintiff has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause customer confusion."  *See Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012).  The Court concludes that Plaintiff has met its burden of showing that it is likely to prevail on its trademark infringement claim with respect to the League and Team Marks.

#### 1. Ownership of Valid League and Team Marks

To prevail on a Trademark Infringement claim, Plaintiff must establish an ownership interest

---

[14] The FAC also alleges claims for Cancellation of Trademark Registration and Declaratory Relief.  Docket No. 67 at pp. 41-45.

[15] Plaintiff also asserts claims for False Advertising, False Association, and state common law claims for Trademark Infringement, Unfair Competition, False Advertising and Tortious Interference with a Business Relationship. The Court need not address the merits of those claims in light of its other rulings.

in the Marks.  Plaintiff does not dispute that the registration for the Original USFL Marks lapsed after the Old League ceased operations.  Instead, Plaintiff claims that its ownership derives from its continuous, priority use of the Marks beginning in 2006.  Defendants argue that they have established ownership of the Marks because: (1) defendant TSL owns incontestable trademark registrations in the League Marks and pending applications in the Team Marks; (2) the Original USFL Marks in which Plaintiff asserts ownership rights were abandoned; and (3) Plaintiff failed to independently establish any valid rights in the Marks.

Federal registration of a trademark is prima facie evidence that the registrant is the owner of the mark.  Lanham Act § 7(b), 15 U.S.C. § 1057(b); Lanham Act § 33(a), 15 U.S.C. § 1115(a). "Therefore, [a] registrant is granted a presumption of ownership, dating to the filing date of the application for federal registration . . . ." *Sengoku Works LTD. v. RMC Intern., Ltd.,* 96 F.3d 1217, 1219 (9th Cir. 1996).  A non-registrant can rebut this presumption, however, by showing by a *preponderance* of the evidence that he used the mark in commerce first.  *Id.* at 1220.  Where a non-registrant satisfies this burden, a trademark registration may be invalidated.  *Id.*  A trademark registration may also be canceled for fraud under 15 U.S.C. § 1064(3).  To establish cancellation for fraud, "a party must show blatant misuse of the subject mark in a manner calculated to trade on the goodwill or reputation of someone else.  *Patagonia, Inc. v. Anheuser-Busch, LLC.,* 2020 WL 8514835, at *12 (C.D. Cal. Sep. 3, 2020).

The Court finds that Defendants are entitled to the presumption of ownership in the League Marks dating back to March 24, 2011.  The Court also finds that Plaintiff's have failed to demonstrate, at this stage of the proceedings, that the League Marks are subject to cancellation for fraud. To establish that a party has committed fraud on the USPTO, a litigant must show: (1) a false statement of material fact; (2) the registrant's knowledge or belief that the statement is false; (3) intent to induce reliance; (4) reasonable reliance; and (5) damages proximately resulting from the reliance.  *Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013). Plaintiff's sole evidence of an alleged fraud on the USPTO is a purported business plan referencing Old League players and teams submitted by Cuadra on behalf of USFL-2011 in applying for the Registered Marks.  However, there is no evidence explaining how these references constitute misrepresentations, how they were used or of Cuadra's intent at the time.  In the absence of any such evidence, plaintiff has failed to make even the most minimal showing of fraud.[16]

Plaintiff attempts to overcome or rebut this presumption by showing Plaintiff's use in commerce before the Defendants' use. *Sengoku Works LTD. v. RMC International, Ltd.,* 96 F.3d 1217, 1219 (9th Cir. 1996).  "To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first." *Id.*  Rather, "the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Id.*  "For both goods and services, the use in commerce requirement includes (1) an element of actual use, and (2) an element of display." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1159 (9th Cir. 2001). "In determining whether the two prongs of the use in commerce test have been satisfied," the Ninth Circuit has "generally followed a totality of the circumstances approach." *Rearden*, 683 F.3d at 1205.  "This approach turns on evidence showing, first, adoption, and, second, use in a way

---

[16] Plaintiff appears to be asking that the Court infer fraud on the USPTO based on Cuadra's guilty plea in an unrelated embezzlement case.  Motion at pp. 6-7.  The Court finds this evidence irrelevant.

sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind." *Id.*; *see also Pac-Tel*, 242 F.3d at 1159 (stating that when applying the totality of the circumstances approach, a district court should also consider non-sales activities to determine whether a service mark has been "rendered in commerce.").

The sole evidence of use of the League Marks prior to the launch of the New League in June 2021 is the sale of apparel by the Old League's licensee American Classics from October 2011 through December 2021. Defendants rely heavily on the fact that Mr. Ehrhart did not have any rights to license to American Classics at the time of the parties' licensing agreement in July 2011 because the Original USFL Marks had been abandoned or declared "dead" by that time. Opposition at pp. 9-12. This may be true, but it is irrelevant. Once abandoned, Mr. Ehrhart could establish ownership through use of the Marks. *California Cedar Products Co. v. Pine Mountain Corp.,* 724 F.2d 827, 830 (9th Cir. 1984) ("first party to use an abandoned trademark in a commercially meaningful way after its abandonment, is entitled to exclusive ownership and use of that trademark"). Indeed, that is how Defendants allegedly acquired its own interests in some of the Marks.

Defendants also argue that after registration, the Registered Marks had a priority use date of June 24, 2011, which made Mr. Ehrhart and American Classics' use of the League Marks for apparel an "infringing use." Opposition at pp. 12-13. Defendants, however, fail to show that their predecessor USFL-2011 made any commercial use of the Registered Marks. Possession of a Registered Mark is simply not enough to establish "Ownership" under the relevant case law. *Sengoku Works LTD.,* 96 F.3d at 1220 (non-registrant can rebut presumption by showing that the registrant had not established valid ownership rights in the mark at the time of registration—in other words, if the non-registrant can show that he used the mark in commerce first, then the registration may be invalidated).

Likewise, Defendants have not provided any persuasive evidence to support their other arguments to overcome Plaintiff's reliance on American Classics' use of the League Marks. Defendants claim that the use of the USFL and Old Teams names on apparel are merely "ornamental" and are not "source identifying." Opposition at pp. 13-14. This argument directly contradicts Defendants' other arguments that rely on the public's desire for and memory of the USFL. Indeed, it was Defendants' intentional decision to capitalize on the public's interest by calling its New League "USFL," and using Old Team names instead of choosing new names for the New League and Teams. In addition, Defendants chose to ask former USFL players and coaches to promote the New League. There is an obvious reason for these decisions that negates Defendants' attempt to argue that there is no Old League name or team logo recognition–there is a "nostalgia among older football fans" for the USFL and its team "names, jerseys and helmets." Opposition at pp. 17-18. The Court thus concludes that American Classics' use of the Marks on apparel was source identifying.

Plaintiff also relies on other examples of use in order to establish ownership in the Marks: (1) a 25th USFL reunion hosted by Mr. Ehrhart in 2007; (2) an interview of Mr. Ehrhart for an ESPN documentary in 2008; (3) consultation and releases for use in various book and film projects from 2006 to 2016; and (4) managing the American Classics royalties from 2011 through December 2021. Defendants argue that this conduct does not establish commercial use. The Court, however, must look at the totality of the circumstances to determine use in commerce. *Pac-Tel*, 242 F.3d at 1159 (stating that when applying the totality of the circumstances approach, a

district court should also consider non-sales activities to determine whether a service mark has been "rendered in commerce."). While the Court concludes that none of this evidence alone would establish commercial use, taken as a whole and in combination with the apparel sales, it shows an intent to use the Marks in commerce and to maintain the association of the USFL Mark with the Old League. *See Brookfield Communications, Inc. v. West Coast Entertainment Corp*, 174 F.3d 1036, 1051 (9th Cir. 1999) ("[t]he purpose of a trademark is to help consumers identify the source, but a mark cannot serve as source-identifying until it is used in public in a manner that creates an association among consumers between the mark and the mark's owner."). On the current record, the Court concludes that Plaintiff has met its burden.

With respect to the Team Marks, Defendants' ownership rights derive from the WHRQ Applications and TSL Applications. There are no registered marks and no evidence of Defendants' use of the Team Marks in commerce until after the launch of the New League in June 2021. Again, the only evidence of use of the Team Marks in commerce is the apparel sales by the Old League's licensee, American Classic and the other non-sales activities. Accordingly, the Court also concludes that Plaintiff has met its burden with respect to ownership of the Team Marks.

The Court thus concludes that Plaintiff has demonstrated a protectable ownership interest in both the League and Team Marks.

### 2. Likelihood of Confusion

"While maintenance of a valid and protectable [trade]mark is a prerequisite to bringing a trademark claim, the likelihood of confusion is the central element of a trademark infringement action." *Cytosport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1065 (E.D. Cal. 2009). Likelihood of confusion "requires the factfinder to determine whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005). Likelihood of confusion is determined by evaluating: (1) the similarity of the marks; (2) relatedness or proximity of the products or services; (3) marketing channels used; (4) strength of the mark; (5) evidence of actual confusion; (6) degree of care likely to be exercised by the purchaser in selecting goods; (7) the accused infringers' intent in selecting his mark; and (8) likelihood of expansion of the product lines. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). This test is "pliant" and the "relative importance of each individual factor" is "case-specific" and will vary in each case. *Brookfield Communications*, 174 F.3d at 1054. "Two particularly probative factors are the similarity of the marks and the proximity of the goods." *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) (*citing Lindy Pen Co. v. Bic Pen Corp.*, 796 F.2d 254, 256-57 (9th Cir. 1986)).

After considering and applying the *Sleekcraft* factors in this case, the Court finds that there is a likelihood of confusion because the marks at issue, the goods, the channels of trade (regarding sales of branded apparel), and potential customers are nearly identical. The circumstantial evidence of Defendant's intent is most important in applying the *Sleekcraft* factors to this case. The likelihood of confusion is enhanced because Defendants have created and are using the confusion between the Old and New Leagues to their own benefit or advantage. The evidence shows that Defendants deliberately decided to launch their new league using the same names and teams as the Old League in an apparent attempt to capitalize on the nostalgia for the Old League. The Marks for the League and team logos are nearly identical. Defendants' press releases, public

statements and news coverage of the New League's launch have specifically referenced a "relaunch," a "return" and other verbiage conflating the two leagues. Defendants also used former USFL players and coaches to advertise the New League. The Court thus rejects Defendants' incredibly disingenuous argument to the contrary.

Accordingly, the Court concludes that Plaintiff has demonstrated a likelihood of confusion.

### B.     Likelihood of Irreparable Harm

Harm is considered irreparable when it cannot be remedied except through injunctive relief. *See Designer Skin, LLC v. S&L Vitamins, Inc.*, 2008 WL 4174882, at *4 (D. Ariz. Sept. 5, 2008); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, 518 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007). Injury to a company's goodwill is often difficult to calculate and, thus, typically constitutes an irreparable injury. *Rent-A-Center, Inc. v. Canyon Television & Appliance*, 944 F.2d 597, 603 (9th Cir. 1991). The purpose of a preliminary injunction is to prevent future harm, not to remedy past harm. Moreover, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Although Plaintiff has demonstrated likelihood of success on the merits of its Trademark Infringement claim, and is thus entitled to a rebuttable presumption of irreparable injury under 15 U.S.C. § 1116(a), Defendants have presented sufficient evidence to rebut this presumption. The evidence of Plaintiff's minimal use of the Marks to preserve the USFL's legacy and reputation significantly reduces the possibility that Plaintiff would suffer irreparable injury in the absence of an injunction. Plaintiff claims that irreparable harm exists because Defendants' assumption of the Team and League Marks prevents its ability to preserve what remains of the USFL's legacy. The Court disagrees. For the past four decades, Plaintiff's members use of the Marks and efforts on behalf of the USFL were virtually nonexistent. In fact, Defendants have undoubtedly generated more goodwill for the USFL since announcing the launch of the New League eight months ago than Plaintiff's members have accomplished in the past forty years. The Court recognizes that "[e]vidence of loss of control over business reputation and damage to goodwill [can] constitute irreparable harm, so long as there is concrete evidence in the record of those things." *Adidas American, Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 756 (9th Cir. 2018) (quotations omitted). Here, there is no such evidence and Plaintiff's claimed injury is based on speculation. *Caribbean Marine Services v. Baldridge.*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.").

The Court also concludes that any damage suffered by Plaintiff can be addressed by monetary compensation. Although Plaintiff's members may have used the League and Team Marks in commerce, their use was minimal and any alleged harm can be remedied by money damages. Because there is absolutely no evidence that Plaintiff intends to establish a competing football league, any damages incurred by Plaintiff will directly result from its loss of potential licensing income which can be easily compensated by monetary damages. Simply stated, such economic loss is compensable, not irreparable. *See Cotter v. Desert Palace, Inc.,* 880 F.2d 1142, 1145 (9th Cir. 1989); *L.A. Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1202 (9th Cir.1980). The Court concludes that monetary damages will be adequate compensation for Plaintiff's losses in this case.

In addition, Plaintiff's delay in bringing this action demonstrates the lack of irreparable harm. *See Lydo Entertainment, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights.  By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action...") (citations omitted).   Defendants formally announced the launch of the New League in June, 2021.  Plaintiff was fully aware that Defendants were drafting players, starting training camps and taking all steps necessary to start playing games by April, 2022.  Yet Plaintiff waited until February 28, 2022 to bring this case.  Plaintiff relies on "ongoing conversations" with Defendants in order to resolve the matter as the reason for the delay.  Yet the evidence is undisputed that Defendants were clear from the outset–they were adamant in their belief that they had the absolute and unfettered rights to use the Marks, and they were not interested in any further meetings or conversations with Plaintiff, or interested in a resolution of the matter that might have benefitted both parties.  Thus, Plaintiff's "delay necessarily suggests that a lack of urgency exists" for purposes of assessing irreparable harm.  *Kerr Corp. v. North American Dental Wholesalers, Inc.*, 2011 WL 2269991 at *3 (C.D. Cal. June 9, 2011).

Accordingly, the Court concludes that Plaintiff is not likely to suffer irreparable harm in the absence of injunctive relief.

### C.      Balance of Equities

In considering whether injunctive relief is appropriate, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (internal citations and quotation marks omitted); *see also International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993) ("In evaluating the balance of hardships a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises.").  After weighing the potential injury to each party in this case, the Court concludes the balance of equities overwhelmingly favors the Defendants.

 Plaintiff asserts its ownership rights in abandoned Marks that have been barely used for decades.  Plaintiff does not seek to use the Marks to promote its own football league that would compete with Defendants' New League, and Plaintiff's members' activities in the past forty years to preserve the legacy of the Old League are virtually nonexistent.  Plaintiff has used the Marks to sell branded apparel, but those sales have amounted to less than $20,000 in royalties over the past twenty years.  Moreover, Plaintiff's own delay in bringing this action, knowing that Defendants had invested tens of millions of dollars, and waiting until just before games were about to begin clearly demonstrates that the balance of hardships favor Defendants.

Defendants made substantial investments in intellectual property rights, contracts with national broadcasting companies, players, stadiums, coaches, ticket and concession vendors and more.  Players have been at training camps and are scheduled to begin playing games on April 16, 2022.  An injunction at this stage would not just require a name and jersey change as suggested by Plaintiff. An injunction would effectively stop all of the New League's activities while Defendants rebranded both the league and the teams, jeopardizing Defendants' investments and threatening the existence of the New League itself.  Plaintiff's members as Old League past team owners, certainly were aware of and understood the devastating impact injunctive relief would have on the

success of the New League. If the Court were to enjoin Defendants from using the Marks, Defendants would need to reproduce the footballs, sideline gear, coaches' gear, hats, ball bags, ball boy gear, chain crew gear, down markers, pylons, signage, digital assets and fan apparel that Defendants spent months, even years, and millions of dollars developing and producing.

The Court thus concludes that the balance of hardships overwhelmingly favors the Defendants. The record in this case clearly establishes that granting Plaintiff's Motion for a Preliminary Injunction would be plainly inequitable and extremely prejudicial to Defendants.

### D.  Public Interest

"The public interest analysis for the issuance of a preliminary injunction requires [the court] to consider 'whether there exists some critical public interest that would be injured by the grant of preliminary relief.'" *Independent Living Center of Southern California, Inc. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009) (*vacated on other grounds, Douglas v. Independent Living Center of Southern California*, 565 U.S. 606 (2012)). When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be at most a neutral factor. *Cazorla v. Hughes*, 2014 WL 12235425 (C.D. Cal. Apr. 7, 2014) (*quoting Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138-39 (9th Cir. 2009)). Here, because of Plaintiff's delay, the impact of an injunction is no longer limited to the parties, and would significantly impact the interests of the public.

Although there is an identifiable and important public interest in minimizing consumer confusion as a result of the misuse of a trademark, the risk here is limited to a very small number of potential licensed apparel sales. In contrast, Defendants' numerous business partners in Birmingham, Alabama (where New League players and staff will reside and games will be played) and elsewhere will experience significant losses and damages if injunctive relief is granted. Player and staff salaries and livelihoods would be at risk. NBC would lose substantial advertising revenue and be forced to modify its broadcasting schedules. The Stadiums' concessions sales, mascots, and apparel would be shut down. Consumers who had purchased tickets would lose the value of their tickets. Had the Plaintiff filed suit before all of these contractual obligations and investments, before the player draft in February 2022 and training camp in March 2022, before all the uniforms and equipment had been ordered, and before Defendants' broadcast partners had made all the necessary preparations to televise games, the analysis of public interest factors may have favored Plaintiff. Because of the delay, however, there is an unacceptable level of economic harm and this factor weighs strongly against granting Plaintiff's Motion.

### IV.  CONCLUSION

For all the foregoing reasons, Plaintiff's Motion is **DENIED**.


IT IS SO ORDERED.